UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
DEXTER 345, INC., DEXTER PROPERTIES, LLC and
ESPLANADE 94 LLC,

                                  Plaintiffs,     11 CV 1319 (RJS)

                 -against-

ANDREW M. CUOMO, as Governor of the State of New
York; and THE STATE OF NEW YORK,

                                  Defendant.
------------------------------------------------------------------------ x

**INTERVENOR-DEFENDANT CITY OF NEW YORK'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF ITS CROSS-MOTION TO DISMISS THE COMPLAINT**

MICHAEL A. CARDOZO
Corporation Counsel of the
City of New York
Attorney for Intervenor-Defendant
100 Church Street
New York, New York 10007
(212) 788-1035

GABRIEL TAUSSIG
ROBIN BINDER
SHERYL R. NEUFELD,
          Of Counsel.

APRIL 22, 2011

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT:  ...........................................................................................................3

POINT I:  PLAINTIFFS' APPLICATION FOR A
PRELIMINARY INJUNCTION SHOULD BE DENIED ...................................................3

POINT II:  PLAINTIFFS' CLAIMS THAT CHAPTER 225
       EFFECTS BOTH A FACIAL AND AS APPLIED
       TAKING UNDER THE UNITED STATES AND NEW
       YORK STATE CONSTITUTIONS ARE NOT RIPE FOR
       JUDICIAL REVIEW AND, IN ANY EVENT, FAIL TO
       STATE A CLAIM .................................................................................12

POINT III:  PLAINTIFFS' SUBSTANTIVE DUE PROCESS
       CLAIMS UNDER FEDERAL AND STATE LAW
       FAIL TO STATE A CLAIM. .................................................................21

POINT IV:  PLAINTIFFS' FEDERAL AND STATE EQUAL
       PROTECTION CLAIMS FAIL TO STATE A
       CLAIM..................................................................................................22

CONCLUSION............................................................................................................23

## PRELIMINARY STATEMENT

Intervenor-Defendant City of New York submits this memorandum of law in opposition to plaintiffs' motion for a preliminary injunction enjoining the enforcement of recent amendments to the New York State Multiple Dwelling Law ("Multiple Dwelling Law" or "MDL") and other local laws which are contained in Chapter 225 of the 2010 laws of the State of New York, as amended by Chapter 556 of the 2010 laws of the State of New York ("Chapter 225"), and in support of its cross-motion to dismiss the complaint in its entirety. Among other things, Chapter 225 clarifies some of the ways in which buildings classified as Class A multiple dwellings (i.e., the type of buildings that are commonly thought of as residential) may be used and occupied. Specifically, these amendments spell out the City's long-held position that Class A multiple dwelling units may not be used for transient occupancy (i.e., occupancy less than thirty days). As a result of these amendments, which were enacted on July 16, 2010, as of May 1, 2011 plaintiffs will no longer be able to rely on any alleged ambiguity in the language of the applicable law, to support the rental of their Class A single room occupancy ("SRO") buildings as so-called "budget hotels," in violation of their intended residential use.

As detailed below, plaintiffs' claims, which assert under both federal and New York State law, that Chapter 225 effects a regulatory taking of their buildings both on its face and as applied, and deprives them of their substantive due process and equal protection rights, are either not ripe for judicial review or fail to state a claim. Thus, the City submits that the complaint should be dismissed. However, at a minimum, there is no question that plaintiffs are not likely to succeed on the merits of their takings clause claim, which is the only claim upon which they have based their motion for a preliminary injunction. Moreover, it is clear that, as a matter of law, even if plaintiffs can show that Chapter 225 effects a compensable regulatory

taking of their property, plaintiffs' loss is fully compensable with monetary damages and, thus, does not constitute irreparable injury necessitating the grant preliminary injunctive relief.

Significantly, it is the defendants that will be injured if plaintiffs' requested injunctive relief is granted. As detailed in the April 21, 2011 Declaration of James Colgate ("Colgate Dec.") and submitted herewith, without the clarifying language contained in Chapter 225, after the New York State Supreme Court, Appellate Division, First Department's decision in City of New York v. 330 Continental, 60 A.D.3d 226 (1st Dept. 2009) in 2009, each and every Class A multiple dwelling building throughout the City (i.e., almost every building typically thought of as an apartment building) could have just under half of its units used as hotel rooms. The MDL and the City's Building, Fire and Housing Maintenance Codes establish stricter fire safety standards for dwellings, such as hotels, that rent rooms on a day-to-day basis (i.e., Class B multiple dwellings) than for Class A dwellings which are intended for month-to-month, long-term residence by permanent occupants who are more familiar with the layout of the building and available exits. Typically, buildings classified as Class A multiple dwellings are not required to and do not meet these strict fire safety requirements and, when illegally used as hotels, create serious safety issues for tourists who are likely unaware that they are staying in rooms offered in violation of the law. Moreover, when apartment buildings are used partially as hotels, it often creates untenable living conditions for the permanent residents and diminishes the stock of affordable permanent housing. Thus, implementation of the amendments is necessary to protect the public health, safety and welfare and should not be enjoined by this Court.

# ARGUMENT[1]

## POINT I

## PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED.

A preliminary injunction "is not a remedy which issues as of course." Weinberger v. Romero-Bancelo, 456 U.S. 305, 311 (1982). As a result, in exercising its sound discretion to determine a motion for a preliminary injunction, a court of equity may consider a number of factors including whether the moving party is guilty of unreasonable delay.

It is well established that the defense of laches bars a plaintiff's claim for equitable relief if the "plaintiff in asserting his right is guilty of unreasonable delay that prejudice[s] the defendants." Stone v. Williams, 873 F.2d 620, 623 (2d Cir.), cert. denied, 493 U.S. 959, vacated on other grounds, 891 F.2d 401 (2d Cir. 1989); King v. Innovation Books, 976 F.2d 824, 833 (2d Cir. 1992); Southside Fair Housing Comm. v. City of New York, 928 F.2d 1336, 1354 (2d Cir. 1991). See also, National Council of Arab Americans v. City of New York, 331 F.Supp.2d 258, 265 (S.D.N.Y. 2004) (denying motion for preliminary injunction authorizing a rally when lawsuit to challenge denial of demonstration permit was brought one and a half months after the denial of the permit and a mere fifteen days before the proposed demonstration); Robert MacDonald v. Chicago Park District, 1997 U.S. Dist. Lexis 6900 (N.D. Ill. 1997) (denying plaintiff's request for preliminary injunction on the grounds of laches, having

---

[1] City intervenor-defendant respectfully refers the Court to the accompanying Declarations of James Colgate, supra, Deborah Rand dated April 21, 2011 ("Rand Dec.") and Sheryl Neufeld dated April 21, 2011 ("Neufeld Dec."), for a statement of material facts and relevant exhibits. In addition, the intervenor-defendant relies upon, and incorporates by reference herein, the arguments asserted by the State defendants in their papers in opposition to plaintiffs' motion for a preliminary injunction and in support of their cross-motion to dismiss the complaint.

determined that the plaintiff's delay in filing the suit until fifteen days before the proposed rally date prejudiced the City of Chicago by effectively denying it an opportunity to appeal prior to the rally date); Irish Lesbian and Gay Organization (ILGO) v. Giuliani, 918 F.Supp. 732, 748 (S.D.N.Y. 1996) (holding that ILGO was "guilty of laches for failing to bring the lawsuit earlier when the position of the parties could be thoroughly presented"); WPIX v. League of Women Voters, 595 F. Supp. 1484, 1494 (S.D.N.Y. 1984) (denying preliminary injunction request by television station to broadcast presidential debate in part because "WPIX's eleventh-hour demand for access ha[d] ... unjustly burdened the [defendant] with the task and expense of responding to a set of difficult legal issues on short notice.").

Here, to defendants' detriment, plaintiffs have unreasonably delayed in seeking the instant injunctive relief. As a result, their motion should be denied on laches grounds. Specifically, the amendments challenged by plaintiffs herein (and which are scheduled to take effect on May 1, 2011) were signed into law over eight months ago on July 16, 2010. When initially proposed, the amendments were scheduled to take effect immediately. However, as Governor Paterson noted in his July 23, 2010 approval memorandum, the sponsors of the bill to amend the MDL agreed to enact a chapter amendment which would delay the effective date of the amendments until May 1, 2011. This delay was designed to allow property holders and business owners to adjust to the provisions of the law or dispose of the properties at issue and find alternative sites for their current use. See Neufeld Dec., Exhibit D. The chapter amendment was enacted on December 10, 2010. Chapter 556, Laws 2010.

Plaintiffs, however, did not commence the instant lawsuit until February 25, 2011, over seven months after Chapter 225 was signed into law. April 8, 2011 Declaration of Richard G. Leland ("Leland Dec.") at ¶ 3. In defense of their delay, plaintiffs do not assert that they were

unaware of the date of the enactment of Chapter 225, or that they were unclear as to the effect of Chapter 225 on their properties. Rather, they assert that they did not commence this lawsuit because they were trying to lobby the Legislature to amend the law so that it would not prohibit their so-called budget hotel operations [Plaintiffs' April 8, 2011 Memorandum of Law ("Pl. Mem.") at 9; April 8, 2011 Declaration of Alexander Scharf ("Scharf Dec.") at ¶¶ 30-33], and that they only commenced this action "once it became clear . . . that the Law's enactment date would pass before any other solution was possible." Scharf Dec., ¶ 33. Plaintiffs, however, do not state when exactly it was that it "became clear" that a legislative solution would not be reached, nor do they explain why it would be reasonable to assume that further lobbying could change the parameters of the law as it had been enacted, or why it was not feasible to pursue both litigation and legislative amendment simultaneously.

Moreover, once plaintiffs got around to commencing this action, instead of moving immediately for injunctive relief, or making any effort to contact defendants' counsel on their own, plaintiffs waited eleven days for the assistant Attorney General assigned to defend this action to contact them, before asking for a consent stay of the enforcement of Chapter 225 pending this litigation. Leland Dec. at ¶ 4. It was only after the State defendants rejected plaintiffs' offer to voluntarily stay enforcement of their well-considered law that plaintiffs reached out to this Court regarding the instant motion. Leland Dec. at ¶ 5.

Plaintiffs' irresponsibility in assuming that they could somehow negotiate their way out of having to comply with Chapter 225 as of May 1, 2011 put defendants and intervenor-defendant City of New York in the position of having only two weeks (one of which was during the Passover holiday) to oppose a motion which plaintiffs had months to think about. In addition, as the motion will not be fully submitted to this court until just four business days

before Chapter 225 is scheduled to take effect, should plaintiffs prevail on this motion, defendants will not have the opportunity to perfect a full appeal in advance of the May 1, 2011 effective date. See MacDonald and ILGO, supra, denying preliminary injunction relief in situations where the delay in bringing preliminary injunction motions prejudiced defendants by effectively denying them the opportunity for full appeal and thorough presentation of their defense.

Contrary to plaintiffs' allegations, the cases cited on pages 8 and 9 of their memorandum of law are not factually similar to the situation presented here, and do not suggest that the instant motion should not be denied on laches grounds.[2] As the court recognized in RxUSA Wholesale (one of the cases relied upon by plaintiffs), "[d]ue to the equitable nature of laches, any resolution must be based on the circumstances peculiar to each case." Id., 467 F.Supp. 2d at 307, citing Stone, supra, 873 F.2d at 623-24. Here, for the reasons detailed above, the facts dictate denial of the instant motion on laches grounds. Indeed, plaintiffs' delay appears to have been nothing more than a well-calculated attempt to continue their illegal hotel use beyond the almost nine months afforded to them by the Legislature. Plaintiffs' actions should

_____

[2] In this regard, unlike the situation presented here, in RxUSA Wholesale, Inc. v. Dep't of Health and Human Servs., 467 F. Supp. 2d 285, 307 (E.D.N.Y. 2006), defendant could not point to any harm which would result from the issuance of the requested injunction. In Kuklachev v. Gelfman, 629 F. Supp. 2d 236, 250 (E.D.N.Y. 2008), aff'd 361 Fed. Appx. 161, 163 (2d. Cir. 2009), plaintiffs' delay in commencing their trademark infringement case and seeking a preliminary injunction was found not to be unreasonable because plaintiffs "diligently pursued their rights, to the extent practical, given that they are foreign nationals who do not speak English and are regularly on tour, making it difficult for them to determine the extent of the harm as it occurred." Here, in light of their alleged attempt to pursue a legislative amendment, there is no question that plaintiffs knew about Chapter 225 and its effect on their properties at or soon after the time it was signed into law. Finally, in relying on Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC, 582 F.Supp. 2d 616, 634 (S.D.N.Y. 2008), plaintiffs fail to note that the Court's decision was based in part on the fact that the defendants failed to demonstrate any harm caused by the delay.

not be rewarded and the instant motion should be denied. As detailed below, while plaintiffs will not be irreparably injured without the requested injunction, the public health, safety and welfare will continue to suffer if the injunction is granted.

Moreover, plaintiffs also fail to meet their burden of establishing that they are entitled to preliminary injunctive relief. To establish that they have a right to a preliminary injunction, plaintiffs must show that (a) that the injunction is necessary to prevent irreparable harm; and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. See Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 77-78 (2d Cir. 1994); Guiness & Sons PLC v. Sterling Pub. Co., 732 F.2d 1095, 1099 (2d Cir. 1984).

However, in a case such as this in which "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard. Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989); Bery v. City of New York, 97 F.3d 689, 694 (2d Cir. 1996), cert. denied, 520 U.S. 1251 (1997). This higher standard "reflects the idea that governmental policies implemented through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995).

As discussed in Point II, infra, plaintiffs do not have a likelihood of success on the merits of their takings clause claim (which is the only claim upon which they base the instant motion). As to irreparable injury, plaintiffs simply have not demonstrated that they will be irreparably injured absent the grant of injunctive relief. Even assuming, arguendo, that Chapter

225 would effectively take away all of plaintiffs' property rights (a point which the City asserts is incorrect as a matter of law in Point II, *infra),* contrary to plaintiffs' assertions [Pl. Mem at 7], the loss of property does not constitute *per se* irreparable injury. Rather, "[w]hether the loss of the Property can create irreparable injury is a fact-sensitive inquiry." SK Greenwich LLC v. W-D Group (2006) LP, 2010 U.S. Dist. LEXIS 112655, *8-10 (S.D.N.Y. 2010). See also Medgar Evers Houses Assocs., L.P. v. Carro, 2001 U.S. Dist. LEXIS 18594, *11 (E.D.N.Y. 2001) (recognizing that irreparable injury is not established as a matter of law simply because real property is at issue).

Like the situation presented here, in SK Greenwich plaintiff's interest in the real estate in question was commercial and the harm it feared was the loss of its investment. The court specifically contrasted this commercial type of loss from the potential loss of a home or a unique piece of property in which there is an unquantifiable interest.[3] Indeed, "[l]osses of interest in real estate are ordinarily compensable by damages, and do not necessarily amount to an irreparable harm as a matter of law." SK Greenwich LLC, at *8-9.

As recognized by the Second Circuit in Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989), a case cited by plaintiffs in support of their motion for a preliminary injunction [Pl. Mem. at 5], the alleged harm that would warrant the issuance of a preliminary injunction "must be one requiring a remedy of more than mere money damages. A monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation." Here, plaintiffs have not set forth evidence of

---

[3] For this reason, the grant of preliminary injunctive relief in Tioronda, LLC v. New York, 386 F.Supp.2d 342 (S.D.N.Y. 2005 [Pl. Mem. at 6-7], where the court found that absent injunctive relief here would be permanent damage to "rare and horticulturally significant trees," is not noteworthy here.

any damages that would warrant the issuance of a preliminary injunction.  As detailed in Point II, *infra*, Chapter 225 does not divest plaintiffs of their property.  However, in the unlikely event that Chapter 225 is found to actually affect a taking, the very nature of the Takings Clause provides that plaintiffs will be afforded just compensation.

Moreover, the remaining cases cited by plaintiffs in support of their argument that their predicted consequences of the implementation of Chapter 225 (i.e., the loss of their hotel business) will cause them irreparable injury [Pl. Mem. at 6-7], are inapplicable here.  In this regard, the injunctive relief granted in Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430 (2d Cir. 1993) was based upon a specific provision in the parties' franchise agreement which called for a stay of the implementation of a decision to add a new Jeep-Eagle dealership in the plaintiff's area pending the outcome of agreed-upon arbitration, not the traditional preliminary injunction standard applicable here.[4]  See also, Rockland Exposition, Inc. v. Alliance of Automotive Serv. Providers of N.J., 2009 U.S. Dist. LEXIS 3993 (S.D.N.Y. 2009) (also concerning an application for specific performance).  Similarly inapplicable are Five Star Dev. Resort Cmtys., LLC v. iStar RC Paradise Vally LLC, 2010 U.S. Dist. LEXIS 25581 (S.D.N.Y. 2010) and Kamine/Besicorp Allegany L.P. v. Rochester Gas & Electric Corp., 908  F.Supp. 1180 (W.D.N.Y. 1995) [Pl. Mem. at 6] which addressed the unique situation of imminent foreclosure by a creditor, Carpenter Technology Corp. v. City of Bridgeport, 180 F.3d 93 (2d Cir. 1999) [Pl. Mem. at 7] which is applicable only to condemnation procedures under Connecticut law (see Medgar Evers Houses Assocs., supra, distinguishing Carpenter on this basis), Southland Corp. v.

---

[4] Notably, in Nemer, the district court had denied preliminary injunctive relief under the traditional PI standard and, in reversing the district court, the Second Circuit stated:  "[a]lthough both standards involve equitable principles and contain common elements, they are different. . . .

<u>Froelich</u>, 41 F.Supp. 2d 227 (E.D.N.Y. 1999) [Pl. Mem. at 7] which addressed only potential trademark infringement and <u>Persaud v. Exxon Corp.</u>, 867 F.Supp. 128 (E.D.N.Y. 2004) which concerned a franchisor's claim for injunctive relief to prevent a franchisee from holding over on the occupation of the franchisor's property.

Finally, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." <u>Weinberger</u>, <u>supra</u>; <u>Harrisonville v. W.S. Dickey Clay Mfg. Co.</u>, 289 U.S. 334, 337-38 (1933). <u>See</u> <u>also</u>, <u>Million Youth March, Inc. v. Safir</u>, 155 F.3d 124 (2nd Cir. 1998) (Second Circuit modified injunction because district court failed to consider government's interest in public health, safety and convenience in balance against First Amendment rights.). In considering an injunction, the Court must balance the interests and possible injuries to both parties. <u>See</u> <u>Yakus v. United States</u>, 321 U.S. 414, 440 (1944). Whether the relief sought is in the public interest is a factor which may be considered. <u>Standard & Poor's Corp. v. Commodity Exchange, Inc.</u>, 683 F.2d 704, 711 (2d Cir. 1982). As explained above and in the Colgate Declaration, delaying the implementation of Chapter 225 would serve to allow transient hotel use to continue in buildings which are not equipped with proper fire safety protections – a direct detriment to the public health, safety and welfare. As a result, plaintiffs' motion for a preliminary injunction should be denied.

---

Taking the wrong legal path led it to the wrong destination." <u>Id.</u>, 992 F.2d at 431 (internal citations omitted).

**POINT II**

**PLAINTIFFS' CLAIMS THAT CHAPTER 225 EFFECTS BOTH A FACIAL AND AN AS APPLIED TAKING UNDER THE UNITED STATES AND NEW YORK STATE CONSTITUTIONS ARE NOT RIPE FOR JUDICIAL REVIEW AND, IN ANY EVENT, FAIL TO STATE A CLAIM.**

"The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth, provides that private property shall not 'be taken for public use, without just compensation.' As its text makes plain, the Takings Clause 'does not prohibit the taking of private property, but instead places a condition on the exercise of that power.'"[5] Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005) (internal citations omitted). The purpose of the Takings Clause is not to limit governmental interference with property rights "but rather to secure compensation in the event of otherwise proper interference amounting to a taking." Id. Thus, by its plain meaning, the Takings Clause is simply about money.

The taking of private property by the government for public use may occur when the government physically occupies or acquires ownership of private property or when the government enacts or enforces laws, regulations or rules that restrict some beneficial use or the full exploitation of private property. See, e.g., Brown v. Legal Foundation of Washington, et. al., 538 U.S. 216 (2003); Palazzolo v. Rhode Island, 533 U.S. 606 (2001). However, property owners are not entitled to just compensation simply because their property rights may have been impaired by the government's actions. "Long ago it was recognized that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the

---

[5] As plaintiffs correctly point out, the analysis of a Takings Clause claim is the same under federal and state law. Pl. Mem. at 11.

community, and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it." <u>Keystone Bituminous Coal Ass'n v. DeBenedictis</u>, 480 U.S. 470, 491-92 (1986).[6]  However, while it is well-settled that the government may regulate the use of property, "if a regulation goes too far it will be recognized as a taking." <u>Pennsylvania Coal Co. v. Mahon</u>, 260 U.S. 393, 415 (1922).

There are two types of regulatory takings challenges.  Facial challenges and as-applied challenges.  Facial challenges apply this standard:  "A statute regulating the uses that can be made of property effects a taking if it '*denies an owner economically viable use of his land . . . .*'" <u>Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.</u>, 452 U.S. 264, 295-96 (1981), (citation omitted) (emphasis added).  In as-applied claims, in contrast, courts have engaged in ad hoc factual inquiries to discern whether the government action complained of constitutes a compensable taking.  <u>See</u> <u>Penn Central v. New York City</u>, 438 U.S. 104, 124 (1978).  Factors that are relevant to the analysis include "the regulation's economic effect on the [property] owner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action."  <u>Palazzolo</u>, 533 U.S. at 617, citing <u>Penn Central</u>, 438 U.S. at 124.

To sustain a facial challenge to Chapter 225, plaintiffs bear a "heavy burden." <u>Sanitation and Recycling Industry, Inc. v. City of New York</u>, 1997 U.S. App. LEXIS 3600, *12 (2d Cir. 1997), citing <u>Younger v. Harris</u>, 401 U.S. 37, 52-53 (1971).  Plaintiffs must establish

---

[6] <u>See</u> <u>also</u> <u>Mugler v. Kansas</u>, 123 U.S. 623, 669 (1887) ("The power which the States have of prohibiting such use by individuals of their property as will be prejudicial to the health, morals, or the safety of the public, is not -- and … cannot be -- burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community.")

that "the challenged law 'could never be applied in a valid manner'." <u>SRI</u>, quoting <u>New York State Club Ass'n, Inc. v. City of New York</u>, 487 U.S. 1, 11 (1988). Plaintiffs have in no way set forth facts sufficient to demonstrate that they are likely to overcome their burden in support of a facial challenge.

As explained in the Colgate Declaration, after the New York State Supreme Court Appellate Division First Department's decision in <u>330 Continental</u>, 60 A.D.3d 226 in 2009, every Class A multiple dwelling building in the City (i.e., most of the apartment buildings throughout the City) could potentially be used, in part, as hotels for day-to-day occupancy. Colgate Dec., ¶ 17. Thus, to succeed on a facial challenge plaintiffs have to show that *under all circumstances* Chapter 225 denies any and all owners of Class A multiple dwellings economically viable use of their property.[7] Plaintiffs, however, have not demonstrated that they are likely to succeed on the merits of their facial attack. Nowhere in their complaint or in the papers submitted in support of their application for a preliminary injunction do plaintiffs allege any facts with respect to the impact of the regulations on any buildings other than their own.[8]

---

[7] While we disagree with plaintiffs' assertion that the <u>Penn Central</u> test applies to facial challenges, even if it did, plaintiffs would have to show either that *under all circumstances* Chapter 225 denies any and all owners of Class A multiple dwellings economically viable use of their property, or that *under all circumstances* Chapter 225 interferes with owners' reasonable investment backed expectations. Plaintiffs have not even attempted to make such a showing. In fact, there is at least one instance where an owner of a Class A multiple dwelling SRO building specifically signed a stipulation with the City in which he expressly acknowledged that his building could not be used for transient occupancies. Neufeld Dec, Exhibit E at ¶ 7.

[8] For this reason plaintiffs' facial Takings Clause claim also fails to state a claim. As stated by the Court in <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007), the complaint must plead "enough facts to state a claim for relief that is plausible on its face." "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). However, this standard "requires 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation' or a series of legal conclusions and factually

Thus, while plaintiffs claim to challenge Chapter 225 on its face, plaintiffs' takings claim is really only an as-applied challenge.[9]  Indeed, it has long been recognized that "whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely 'upon the particular circumstances [in that] case'." Penn Central, 438 U.S. at 124, quoting United States v. Central Eureka Mining Co., 357 U.S. 155, 168 (1958).  See also, Keystone, 480 U.S. at 475 (repeatedly emphasizing that takings decisions can be reached only after examination of "the particular facts").

As to plaintiffs' as-applied takings clause challenge to Chapter 225, plaintiffs' claim should be dismissed as premature because the plaintiffs failed to seek post-deprivation remedies through the state courts.[10]  See Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 195, 105 S. Ct. 3108 (1985) ("[T]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation."); Hodel v. Va. Surface Mining and Reclamation Ass'n, 452 U.S. 264, 297 (1981).

In any event, should the court determine that plaintiffs' as-applied takings clause claims are ripe, they nonetheless must be dismissed for failure to state a claim upon which relief

---

unsupported accusations."  DeStefano v. Duncanson, 2011 U.S. Dist. LEXIS 14916, *7 (S.D.N.Y. 2011), quoting Iqbal.

[9] As a result, if this Court is inclined to grant injunctive relief, such relief should be only as to these individual plaintiffs.

[10] In their memorandum of law, plaintiffs assert that their takings clause claim is ripe whether it is deemed facial or as-applied because the permissible uses of their property under Chapter 225 are already known to a reasonable degree of certainty.  Pl. Mem. at 10.  Plaintiffs however, completely fail to address the additional requirement that they seek post-deprivation remedies through the state court prior to instituting a federal lawsuit under the Fifth Amendment.  Indeed, there is no dispute that plaintiffs have not commenced an inverse condemnation lawsuit in state court pursuant to Article I, Section 7 of the State Constitution.

can be granted.  "[T]he Fifth Amendment is deemed to allow state and local governments broad power to regulate housing conditions without paying compensation for all resulting economic injuries."  Sadowsky v. City of New York, 732 F.2d 312, 317 (2d Cir. 1984).

The first prong of the as-applied regulatory takings analysis looks at the economic effect of the regulation on the plaintiffs.  Plaintiffs assert that if Chapter 225 goes into effect "their property values will plummet, millions of dollars of invested money will be lost, and their businesses will be in grave jeopardy."  Pl. Mem. at 4.  See also, Pl. Mem. at 16-17.  None of these assertions are supported by the allegations in the complaint or plaintiffs' motion papers.

First, nowhere in their papers do plaintiffs set forth any dollars and cents evidence (or even unsupported allegations) showing that Chapter 225 will cause the value of two parcels of land located on the Upper West Side of Manhattan to plummet.  Second, plaintiffs' assertion that if Chapter 225 takes effect they will no longer have any beneficial use of their property is simply false.  Indeed, as explained in the Colgate Declaration, plaintiffs have the ability to revert their illegal transient hotel units to their prior lawful use,[11] or may apply to DOB for a permit to alter the building for any other use permitted in the zoning district in which the building is situated.  Id. at ¶ 30.

---

[11] According to the last-issued Certificate of Occupancy ("C of O") for the premises owned by plaintiff Dexter House [Colgate Dec., Exhibit B], the legal use and occupancy of the building located at 345 West 86th Street, New York, New York, is for a New Law Tenement Class A Multiple Dwelling-Single SRO.  Similarly the buildings owned by plaintiff Esplanade and located at 306 and 308 West 94th Street [Colgate Dec., Exhibit B], New York, New York are for Old Law Tenement Class A Multiple Dwelling Single SROs.  Colgate Dec., ¶ 31.  Prior to Chapter 225, pursuant to MDL §§4(16) & 248.1, plaintiffs' buildings were Class A multiple dwellings and were subject to MDL§4(8)(a)'s requirement that they be occupied for permanent residence purposes. After Chapter 225, plaintiffs' buildings remain Class A multiple dwellings and may continue be occupied for permanent residence purposes.  Colgate Dec., ¶32.

While plaintiffs will have to comply with the procedures explained in the Declaration of Deborah Rand for obtaining a Certification of No Harassment ("CONH") in order to alter their buildings, provided that plaintiffs have not harassed their tenants, the procedures for obtaining a CONH are nowhere near as burdensome as plaintiffs suggest [Pl. Mem. at 16].[12] Indeed, CONH are routinely granted by the Department of Housing Preservation and Development in a matter of months. See Rand Dec. Moreover, plaintiffs' assertions that even if they could obtain the required CONH and building permits, 1) converting their buildings to full apartments is cost prohibitive, and 2) even if they did convert to full apartments it would be virtually impossible for them to charge a sufficiently competitive rent to make any conversion profitable [Pl. Mem. at 17], are not supported by any actual evidence.[13]

Finally, plaintiffs' bald assertions of inability to turn a profit by using the buildings as SROs are not supported by any documentary evidence and, in the case of Dexter, are simply untrue. In this regard, the bald assertions in the April 7, 2011 Declaration of Jay Wartski

---

[12] In fact, a CONH was issued for plaintiff Esplanade's building at 306 West 94th Street in 2008. See Rand Dec., fn. 7.

[13] In footnote 6 of their memorandum of law [at p. 17], plaintiffs incorrectly assert that if they were to convert to full apartments, the rents they could charge would be subject to the Hotel Orders issued by the Rent Guidelines Board. By their terms, these orders apply only to stabilized hotel units occupied by non-transient tenants. See Neufeld Dec., Exhibit F. If the building is converted to apartments and remains rent stabilized (which is dependent upon factors such as the scale of the renovations and the type of funding used to finance the renovations), the building would be under the Rent Guidelines Order applicable to apartments. See Neufeld Dec., Exhibits F and G. Each and every Rent Guidelines Board order issued since 1969 has afforded a rent increase for apartments. See Neufeld Dec., Exhibit G. With respect to hotels, out of a total of 40 orders issued since 1971, 28 have afforded rent increases. See Exhibit H.

("Wartski Dec.") actually show that Dexter will make a profit of $28,000 each month even when it must cease is budget hotel use.[14]

In any event, even if everything plaintiffs say is true, as a matter of law, their allegations of potential loss simply do not set forth a claim for just compensation. See, e.g., Nasca v. Town of Brookhaven, 2008 U.S. Dist. LEXIS 73644 (E.D.N.Y. 2008) (requiring a rental permit in order to rent property did not result in a taking even though it restricted plaintiff's ability to rent his property). As this Court recognized in Rent Stabilization Assn. v. Dinkins, 805 F. Supp 159, 163 (S.D.N.Y. 1992), aff'd 5 F.3d 591 (2d Cir. 1993), "[t]he crucial inquiry . . . [in a takings claim] is not whether the regulation permits plaintiffs to use the property in a 'profitable' manner, but whether the property use allowed by the regulation is sufficiently desirable to permit owners to sell the property to someone else for that use." See also, Pompa Construction Corp. v. Saratoga Springs, 706 F.2d 418, 424 (2d Cir. 1983) ("'the key question' in determining whether a local zoning ordinance was so economically burdensome as to constitute a taking, is whether others 'might be interested in purchasing all or part of the land' for permitted

---

[14] Wartski asserts that the Dexter property presently consists of 90 hotel rooms and 180 SRO rooms [¶ 7], that it costs $100,000 per month to operate Dexter House [¶ 14], and that the median amount Dexter can rent its SRO rooms for is $400/month [¶ 19], which means that Dexter's SRO use presently generates $72,000 each month ($400 x 180 rooms). Dexter, thus, appears to need an additional $28,000 each month to cover its operating expenses above what it gets from its SRO rentals. However, Wartski explains in paragraph 20 of his declaration that without the hotel use, Dexter's operating expenses will decrease by 20 % (i.e, to $80,000 month). Thus, it appears that if the law were to go into effect and Dexter were to continue to rent the same number of SRO rooms that it does now, it would only be $8,000 short each month. However, if Dexter were to rent its 90 hotel rooms as permanent residence SROs (as they are intended to be), even at $400 per unit per month Dexter will generate an additional $36,000 ($400 x 90 rooms). This additional $36,000 of income when coupled with the $72,000 in SRO income that Dexter currently receives equals $108,000 in revenue each month. Accounting for $80,000 in expenses thus means that if Dexter uses its property in accordance with its current C of O, it will still make a profit of $28,000 each month.

uses). Here there is no evidence whatsoever that plaintiffs would not be able to sell their properties should they choose to do so.

Indeed, governmental regulations which have prohibited existing profitable uses or business activities, or which have caused radical reductions in property values, have withstood challenge on takings grounds. See, e.g., Keystone, 480 U.S. 470 (prohibition against mining 50% of coal on property); Concrete Pipe & Products v. Construction Laborers Pension Trust, 508 U.S. 602, 645-46 (1993) (business' participation in employee pension plan); Branch v. United States, 69 F.3d 1571, 1581 (Fed. Cir. 1995) cert. denied, 519 U.S. 810 (1996) (banking); Bowles v. Willingham, 321 U.S. 205, 517-18 (1944) (upholding rent control regulation even though effect of regulation was to reduce rent that landlords could collect); Greystone Hotel Co. v. City of New York, 13 F. Supp. 2d 524, 528 (S.D.N.Y 1998), aff'd, 1999 U.S. App. LEXIS 14960 (2d Cir. 1999), citing Federal Home Loan Mortgage Corp. v. New York State Div. of Housing and Community Renewal, 83 F.3d 45, 48 (2d Cir. 1996) (no regulatory taking because "[a]lthough FHLMC will not profit as much as it would under a market-based system, it may still rent the apartments and collect the regulated rents.").

Nor can plaintiffs establish that the challenged condition interfered with their reasonable investment-backed expectations. While plaintiffs' representatives assert that the corporations which own the properties in question always believed that buildings with C of Os for Class A multiple dwellings could be used partially for day-to-day transient hotel occupancies [Pl. mem. at 17-18] such belief, even if true, is not reasonable.[15] First, as detailed in the Colgate

---

[15] On behalf of plaintiff Dexter, Wartski asserts that when Dexter purchased its property in 1957 the purchase documents indicated that Dexter house was used for both transient and residential purposes. Wartski Dec., ¶ 8. However, none of these documents are presented in support of his assertion in this regard. Moreover, Mr. Wartski himself did not have any interest in the Dexter

Declaration, it has been DOB's long-standing practice that Class A multiple dwellings may only be used for permanent residence purposes (i.e., 30 days or longer). <u>Id.</u> at ¶¶ 8-14. Indeed, DOB routinely issued violations and took enforcement action against owners of buildings where Class A apartments were being occupied transiently. <u>Id.</u> at ¶ 17. Significantly, DOB records indicate that in June 2006, prior to plaintiff Esplanade purchasing the building located at 306 West 94th Street, DOB issued a violation to the building's prior owner for occupying the building "contrary to C of O No. 31742 which indicates that the building is a legal Class A apartment multiple dwelling and single room occupancy" by "offering and renting on a daily basis to visitors." Colgate Dec., Exhibit C. This notice of violation was a matter of public record against the property and was not adjudicated until after plaintiff purchased the building. Colgate Dec., ¶ 30. Thus, prior to purchasing the properties in question here in 2007 [Scharf Dec., ¶ 4], plaintiff Esplanade should reasonably have known that their use as hotels was unlawful.

Moreover, prior to the First Department's issuance of its decision in <u>330 Continental</u>, 60 A.D.3d 226 in 2009 [<u>see</u> Colgate Dec., ¶¶ 16-17], there is no reasonable way that plaintiffs' representatives could have possibly believed that it was legal to operate any hotel for day-to-day use in a building with a Class A multiple dwelling C of O. Wartski Dec., ¶ 9; Scharf Dec., ¶ 8. In this regard, there is no question that prior to the enactment of Chapter 225, MDL §248(16) provided that "it shall be unlawful to rent any room in an SRO multiple dwelling for a period of less than a week." Thus, there was at least a question as to whether SRO units could be legally used only as a hotel for transients who rent rooms for at least a week at a time. <u>See</u> <u>330</u>

property until 2004. <u>Id.</u> at 4. Thus, certainly as to Mr. Warski, for the reasons set forth *infra*, and in light of the fact that he "regularly consults with other owners of similar properties about their properties and businesses [<u>Id.</u> at ¶ 3], any expectation that Dexter House could be used as a hotel is not reasonable.

<u>Continental</u>, 60 A.D.2d at 233. This question clearly negates any suggestion that it would have been reasonable to assume that the law clearly allowed day to day hotel use in Class A multiple dwellings.

Finally, with respect to plaintiff's as-applied takings claim, as stated by the Supreme Court in <u>Penn Central</u>, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124. This prong of the regulatory takings analysis requires the court to "consider the purpose and importance of the public interest reflected in the regulatory imposition." <u>Loveladies Harbor, Inc. v. Untied States</u>, 28 F.3d 1171, 1176 (Fed. Cir. 1994). As detailed in Point I, *supra*, Chapter 225 protects the public health, safety and welfare by ensuring that buildings used for transient occupancies meet basic fire safety requirements and that buildings intended for permanent occupancies remain open and available for such use.

It is therefore clear that that plaintiffs are unlikely to succeed in establishing "'any deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking.'" <u>Meriden Trust & Safe Deposit Co.</u>, 62 F.3d at 455 (quoting <u>Keystone</u>, 480 U.S. at 493). As a result, this Court should not only deny plaintiffs' motion for a preliminary injunction but also grant intervenor-defendant's cross-motion to dismiss. <u>See</u> <u>Atlas Corp.</u>, 895 F.2d at 756 (citations omitted). ("It is not necessary in every case to undertake an evidentiary hearing on the issue of whether a taking has occurred. Summary dismissal of a taking claim is appropriate where the circumstances alleged in the complaint, even if taken as true and all reasonable inferences are drawn in favor of the plaintiff, cannot establish that a taking has occurred.")

**POINT III**

**PLAINTIFFS' SUBSTANTIVE DUE PROCESS
CLAIMS UNDER FEDERAL AND STATE
LAW FAIL TO STATE A CLAIM.**

As pointed out by the State defendants in their March 28, 2011 letter to your

Honor, plaintiffs' substantive due process claims should be dismissed because substantive due

process claims are unavailable where, as here, the Takings Clause provides a method for

evaluating plaintiffs' claims.  In this regard, where "a particular Amendment provides an explicit

textual source of constitutional protection against a particular sort of government behavior, that

Amendment, not the more generalized notion of 'substantive due process,' must be the guide for

analyzing these claims."  Harmon v. Markus, 2011 U.S. App. LEXIS 4629 (2d. Cir. 2011),

quoting Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envt'l. Prot., 130 S. Ct. 2592, 2606

(2010)) (other internal quotation marks omitted);

In any event, even if a substantive due process claim could be raised here, to

successfully plead such a claim, plaintiffs were required to assert that Chapter 225 is arbitrary,

conscience-shocking, or oppressive in a constitutional sense,' and not merely 'incorrect or ill-

advised.'"  Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995).  Plaintiffs have

not done so.  See Complaint, ¶¶ 71-2.  As explained in Matter of Upstate Land & Props., LLC v

Town of Bethel, 74 A.D.3d. 1450, 1452 (N.Y. App. Div. 3d Dept. 2010), "[t]o state a substantive

due process claim in the land-use context, petitioner must allege '(1) the deprivation of a

protectable property interest and (2) that 'the governmental action was wholly without legal

justification.'"  Id., citing Matter of Ken Mar Dev., Inc. v Department of Pub. Works of City of

Saratoga Springs, 53 A.D.3d 1020, 1024-1025 (2008), quoting Bower Assocs. v Town of

Pleasant Val., 2 N.Y.3d 617, 627 (2003); and Town of Orangetown v Magee, 88 N.Y.2d 41, 52-

53 (1996).  As set forth below in Point IV, not only is Chapter 225 not constitutionally

oppressive or wholly without legal justification, it is rationally related to legitimate governmental interests.  As a result, plaintiffs' substantive due process claims should be dismissed for failure to state a claim.

**POINT IV**

**PLAINTIFFS' FEDERAL AND STATE
EQUAL PROTECTION CLAIMS FAIL TO
STATE A CLAIM.**

Finally, plaintiffs have also failed to state a claim for a violation of their equal protection rights.  In addition to amending the MDL to clarify that Class A multiple dwellings may not be used for transient occupancy (i.e., occupancy less than thirty days), Chapter 225 creates a mechanism for a very limited number of Class A apartment hotels (which are a very specific type of building that meet stringent fire safety requirements and were always used as hotels) to obtain Class B C of Os and remain operational as transient hotels during a paperwork correction process.  Colgate Dec., ¶ 20.  Plaintiffs' equal protection claim is based on the incorrect assumption that there is no rational basis for affording these buildings the opportunity to correct their C of Os and continue their hotel use but not afford the same opportunity to Class A SROs.  Complaint, ¶ 78; Pl. Mem. at 4, n. 3.

As so-called budget hotel owners are not members of any suspect class, and a statute which regulates the permissible occupancy of buildings does not impinge upon fundamental rights, in order to withstand an equal protection challenge, Chapter 225 need only further a legitimate state interest.  Cleburne v. Cleburne Living Center, 473 U.S. 432, 439-441 (1985) ("Unless a classification warrants some form of heightened review because it jeopardizes the exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.")

A statute which is subject to rational basis scrutiny "is presumed to be constitutional, and the party challenging the statute bears the heavy burden of proving that there is no reasonably conceivable state of facts which rationally supports the distinction," D'Amico v. Crosson, 93 N.Y.2d 29 (1999), citing Heller v. Doe, 509 U.S. 312, 320 (1993); Henry v. Milonas, 91 N.Y.2d 264, 268 (1998); Maresca v. Cuomo, 64 N.Y.2d 242, 250 (1984), app. dismissed 474 U.S. 802.

"The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." Berman v. Parker, 348 U.S. 26, 33 (1954). The Colgate Declaration makes clear that Chapter 225, including the paperwork correction option, reflects rational decisions about fire safety, historical use and how buildings were initially constructed and has the effect of permitting long-standing legitimate hotels with appropriate fire safety protections to stay and requiring dwellings that were illegally converted to hotels to be put back to use as affordable housing. Id. at ¶¶ 20-29. As a result, there is no way plaintiffs will ever be able to establish as a matter of law that Chapter 225 does not have a rational basis and plaintiffs' equal protection claims should be dismissed for failure to state a claim.

**CONCLUSION**

As plaintiffs unreasonably delayed in commencing this action, will not be irreparably injured if Chapter 225 takes effect on May 1, 2011 and cannot establish a clear likelihood of ultimate success on the merits of their takings clause claim, their application for a preliminary injunction should be denied. Moreover, as plaintiffs' takings clause, substantive due

process and equal protection claims are either not ripe or fail to state a claim, intervenor-defendant City of New York's motion to dismiss the complaint should be granted.

Dated:    New York, New York
          April 22, 2011

                              Respectfully submitted,


                              MICHAEL A. CARDOZO
                              Corporation Counsel of the
                                City of New York
                              Attorney for Intervenor-Defendant
                              100 Church Street
                              New York, New York 10007
                              (212) 788-0818


                              By:    _____s/_____
                                     Sheryl R. Neufeld
                                     Assistant Corporation Counsel